RODNEY W. MCNEIL, EXECUTOR AND TRUSTEE UNDER
THE WILL OF I.N. MCNEIL, DECEASED

V.

OTEY L. KINGREY, ET AL.

Record No. 860469

March 3, 1989

Present: Carrico, C.J., Poff,[1] Compton, Stephenson, Russell, Thomas, and Whiting, JJ.

---

[1] Justice Poff participated in the hearing and decision of this case prior to the effective date of his retirement on December 31, 1988.

*G. Steven Agee (Charles H. Osterhoudt; Osterhoudt, Ferguson, Natt, Aheron & Agee, P.C.,* on briefs), for appellant.
*William C. Maxwell (Jolly, Place, Fralin & Prillaman, P.C.,* on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

In this case, we decide whether the claimants of prescriptive rights of way over a rural dirt road near the City of Roanoke have borne their respective burdens of proof. In addition, we determine who bears the burden of showing not only the nature and character of a proposed change in the prescriptive use, but also that such change will cast no additional burden on the servient tract.

Otey L. Kingrey, T.R. Leslie, Juanita Long Kingrey, Hortense K. Shimchock, William M. Kingrey, Jr.,[2] and Calvin W. Powers (the Kingreys), and Jimmy C. Preas, filed a bill of complaint against Rodney Ware McNeil, Executor and Trustee under the will of I.N. McNeil, to establish prescriptive easements in a dirt road on a 12-foot wide strip of land owned by McNeil in Roanoke County. The dirt road, used by McNeil's predecessors to reach their property south of Virginia State Route 419 (formerly Route 119 or Starkey Road) (the state highway), extends south from the state highway for a distance of about 400 feet. The Kingreys now own 1.2 acres on the east side of the dirt road, and Preas owns .68 acres on the west side.

The trial court found that the Kingreys and Preas had proven their rights to such easements by clear and convincing evidence, and that they had the right to use the dirt road in the proposed commercial development of their properties. Therefore, the trial court enjoined McNeil from interfering with those rights. McNeil appeals.

Because the Kingreys and Preas prevailed in the trial court, we state the evidence in the light most favorable to them. *Litchford* v. *Hancock*, 232 Va. 496, 497, 352 S.E.2d 335, 336 (1987). The Kingreys' house and curtilage, which abutted the state highway, were taken when the state highway was widened. Prior to its widening, they and their predecessors used the state highway as their means of access. In the rear of their original two-acre lot, however, they engaged in some agricultural activities, requiring access along the dirt road. Their evidence showed that, beginning at least in 1930 and up until 1972, they regularly and continuously used and maintained the dirt road with the knowledge but without the permission of its owner, Callie Campbell, under the belief that they had a right to do so. They ran vehicles over the dirt road two to three times a month to carry feed to their chick-

---

[2] Willie Belle Kingrey was substituted as a complainant after William's death.

ens and hogs, twice a year to butcher hogs for themselves and others, twice a year to remove a hay crop, and two times annually thereafter to spray and harvest the apples from trees they planted to replace their haying activities. One of the Kingreys testified that they, a Mr. Warner, and "the Lyons boys," who apparently also used the dirt road, and Campbell, maintained the dirt road by filling potholes and making other repairs any time they were needed, sometimes two or three times a year.

Preas's .68-acre lot lies approximately 230 feet south of the state highway. This lot came from a larger tract of 2.014 acres which Gertrude Smithers York acquired through *mesne* conveyances from the Kingreys in 1924.

Vera York MacMackin, Gertrude York's daughter, who lived in York's house near the state highway, testified that the Yorks made use of the dirt road under the belief that they had a right to do so, with Campbell's knowledge and without objection or permission. MacMackin indicated that, originally, the Yorks reached their house using a driveway abutting the state highway. After the state highway was widened, at a time not shown in the record, the Yorks had to travel up the first 30 feet of the dirt road to get to their new driveway, because the widening apparently required a cut and left a bank between the York property and the state highway. MacMackin remembered that from 1930 until 1951, her brother, Raymond York, helped "repair the road quite a bit" and that her grandfather and brother used it "whenever they wanted to."

Albert Warner, who lived in the neighborhood from his birth in 1930 until 1955, said that "anybody used the road to play on that lived in the area," presumably including the York children. Otey Kingrey testified that from 1930, the Yorks used the dirt road whenever they wanted to, just as everyone else did, and that Raymond York would walk or drive a vehicle on the dirt road in coming and going to mow the bank on the York's side of the dirt road. None of the witnesses testified as to the frequency or regularity of such uses.

After Gertrude York sold her house and that portion of the lot adjoining the state highway in 1951, retaining what later became the Preas lot, MacMackin used the dirt road about twice a year until 1964 to see that the remaining .68-acre lot was mowed. She sold the lot to Albert and Girlie L. Childress in 1964. Thereafter, Mr. Childress kept a calf and planted a garden on the vacant lot.

These activities required him to use the dirt road two to three times a week, until 1969 or 1970, when his leg was amputated. After that, Mr. Childress never went back on the property, and he and his wife sold it to Preas on October 20, 1972. Preas brought a mobile home onto the lot shortly thereafter. He or his tenants have occupied it and have used the dirt road as their means of access ever since.

None of the parties introduced any evidence as to the kind or quantity of the proposed commercial traffic upon the dirt road.

One who claims a prescriptive easement over the property of another has the burden of producing clear and convincing proof of each of the necessary elements thereof. *Pettus* v. *Keeling*, 232 Va. 483, 486, 352 S.E.2d 321, 324 (1987). Those elements are: exclusive, continuous, uninterrupted, adverse use of the roadway, under a claim of right, with the knowledge and acquiescence of the owners of the land over which it passes for a period of at least 20 years. *Id.* at 485, 352 S.E.2d at 323. Although a failure to show the origin of the use raises a presumption that the easement originated either adversely or by grant, the presumption only arises *after proof* that "a way has been thus used, openly, uninterruptedly, continuously and exclusively for a period of more than twenty years . . . ." *Williams* v. *Green*, 111 Va. 205, 207, 68 S.E. 253, 254 (1910). The extent of the prescriptive easement "is measured by the character of the use." *Pettus*, 232 Va. at 490, 352 S.E.2d at 326.

The first issue in this case turns on whether the Kingreys and Preas have each introduced sufficient evidence to support the trial court's finding that they and their respective predecessors have made continuous and uninterrupted use of the easements for the required number of years. The required continuity will depend on "the nature of the easement and the land it serves, as well as the character of the activity . . . ." *Ward* v. *Harper*, 234 Va. 68, 72, 360 S.E.2d 179, 182 (1987). Although the use need not be "daily, weekly, or even monthly," in the case of seasonal operations on mountainous land in a remote area, *id.* at 72, 360 S.E.2d at 182, it nonetheless must "be of such frequency and continuity as to give reasonable notice to the landowner that [such a] right is being exercised against him," 2 Minor on Real Property § 990, at 1274 (F. Ribble 2d ed. 1928). Therefore, the use must be more than sporadic and of an indefinite nature.

█ In our opinion, the Kingreys' evidence is sufficient to justify the trial court's finding that they had continuously and uninterruptedly used the dirt road for access to their land for agricultural purposes in a rural area for more than 20 years. Because the evidence is insufficient to support a finding that it was a prescriptive easement for anything but agricultural purposes, we find that the trial court erred in failing to limit the easement to those purposes. Our reasons are discussed later.

█ In contrast to the Kingreys' evidence of use during the prescriptive period, we conclude, as a matter of law, that Preas's evidence is insufficient to show that he and his predecessors, continuously and without interruption, used the portion of the dirt road beginning 30 feet south of the state highway for the required 20-year period. Although a fact finder could reasonably infer that the Yorks continuously used the first 30 feet to get to their house after the state highway was widened, there was no proof of when this use began. Because a claimant must establish when the prescriptive period began to run, *Clatterbuck v. Clore*, 130 Va. 113, 121, 107 S.E. 669, 672 (1921), Preas cannot rely upon this use to establish his easement.

█ In our opinion, the evidence of the Yorks' use from 1926 until 1951, "anytime" they wanted to, and of their children playing in the dirt road, as well as of their assistance in repairing the dirt road and mowing their side of the adjacent bank, is insufficient to establish the necessary continuity to give Campbell, a rural landowner, notice that they were claiming a prescriptive right to use the dirt road. Preas showed the necessary continuity of use of the dirt road by Childress, his immediate predecessor in title, beginning in 1964, but it was only for a period of seven years at the most. Preas, however, may not tack his usage on to Childress's period of use because that use had terminated at least 22 months before Preas acquired the lot. A new period of prescriptive use began when Preas and his tenants started to use the dirt road for access in 1972, but that has not continued for the required 20-year period. Therefore, the trial court erred in ruling that Preas had established a prescriptive easement over McNeil's land and in enjoining McNeil's interference therewith.

█ Noting that McNeil was using the dirt road for commercial vehicles and that the area had become commercial, the trial court also found that there was no evidence to show that "the additional traffic created by the commercial use [by the dominant owners]

would overburden the roadway . . . ." We need not decide whether a prescriptive easement for agricultural purposes is sufficiently broad to include commercial activity, if it does not cast an additional burden on the servient tract.[3] Assuming, but not deciding, that such a change of use may be made, we find that the trial court erred in two respects in placing the burden upon the servient owner to show that the proposed commercial use would have "overburdened" his land.

Apparently, we have not heretofore decided a case dealing with the burden of proof to show the nature, character, and consequences of a change in the use of a prescriptive easement. We have recognized that the proposed uses to be made of a prescriptive easement must be of the "same nature and character" as those exercised during the prescriptive period. *Va. Hot Springs Co.* v. *Lowman*, 126 Va. 424, 430, 101 S.E. 326, 328 (1919). We also said in the same decision that, if the proposed difference in use "is in degree only, and no additional burden is put upon the servient estate, then the new use is within the prescriptive use." *Id.* The imposition of a prescriptive easement is the taking of a property right of the servient owner without payment of compensation. This is why we said that "the law is jealous of a claim to an easement." *Pettus*, 232 Va. at 486-87, 352 S.E.2d at 324. Given these considerations, we are of opinion that one who claims a prescriptive easement has the burden of showing the "nature and character" of the proposed change of his use of the easement, that it is in degree only, and that it imposes no additional burden upon the servient estate.

As we have already noted, no evidence was introduced to show anything other than that the dominant owner was to make a commercial use of his property. There was no showing of its nature and character, or of what burden would have been placed upon the servient tract.

It makes no difference, in our opinion, that the servient owner was using the dirt road as a means of access to his property which was devoted to commercial purposes. The issue turns upon the type of use the dominant owner proposes, not the uses presently being made of the same road by the servient owner. Nor does it matter that the character of the surrounding area has

---

[3] We find that we have not previously dealt with this issue. The courts of other jurisdictions are in conflict. For a collection of the cases, see Annotation, *Extent of, and Permissible Variations in, Use of Prescriptive Easements of Way*, 5 A.L.R.3d 439 (1966).

changed from rural to commercial. Although that might be a consideration in dealing with a grant of a general easement, *Savings Bank* v. *Raphael*, 201 Va. 718, 723, 113 S.E.2d 683, 687 (1960), in our opinion, a change in the character of the surrounding area should not be a factor in deciding whether to further burden a servient owner's land by an existing prescriptive easement. We recognized this by implication in our observation that the alternate use of a prescriptive easement should place "no additional burden" upon the servient estate. *Va. Hot Springs*, 126 Va. at 430, 101 S.E. at 328. For these reasons, we conclude that the trial court also erred in describing the issue as whether there was an "overburdening" of the servient tract. *Id.*

Accordingly, we will affirm the judgment of the trial court to the extent that it found that the Kingreys were entitled to a prescriptive easement over the dirt road for access for agricultural purposes to their property, and enjoined any interference therewith. We will reverse the judgment insofar as it found that the Kingreys were entitled to use the dirt road for commercial purposes and enjoined any interference with that use.

Finding that Preas has failed to prove his claim to a prescriptive easement, we will reverse the judgment in favor of Preas, and enter final judgment vacating the injunction against McNeil.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

THOMAS, J., with whom COMPTON, J., joins, concurring in part and dissenting in part.

I concur with so much of the majority opinion as concludes that the Kingreys established a prescriptive right to use the road in question. I disagree with the majority's conclusion that Preas failed to establish a prescriptive right to use the disputed road. I further disagree with the majority's conclusion concerning the present use to which the road may be put by those who have a prescriptive right to use that road.

This case was tried to a Chancellor who heard testimony *ore tenus*, who reviewed deeds concerning the property in question, and who viewed the property. The majority was required to view the evidence in the light most favorable to the prevailing parties,

the Kingreys and Preas. However, in my opinion, though this rule of appellate review was announced by the majority, it was ignored.

Viewed in the light most favorable to the Kingreys and Preas, the evidence establishes the following: The road has existed since the early 1900s. It is of unknown origin. The Kingreys' predecessors in interest used the road beginning in at least 1930 for any purpose they desired, including ingress and egress to their property, general visitation, bringing feed to hogs and chickens, bringing hogs to be butchered, tending to apple trees, collecting hay, picking berries which grew on a fence beside the road, bikeriding, and as a play area for children. There were no "keep off" signs. There were no "private road" signs. The Kingreys helped maintain the road. They never asked permission to use the road. They used the road as they saw fit for a period in excess of twenty years.

Preas' predecessors in interest were the Yorks and the Childresses. The Yorks owned the property from the early 1900s through 1964. The property was then conveyed to the Childresses who conveyed to Preas in 1972. Preas established that, for more than twenty years, the Yorks used the road as a means of ingress and egress to their property, for general visitation, and as a means to check on the condition of what the Yorks called their "back lots" — the land ultimately conveyed to Preas.

In deciding the question of the existence of prescriptive rights, the majority ignored the critical fact that the road was of unknown origin. We wrote in *Williams* v. *Green*, 111 Va. 205, 207, 68 S.E. 253, 254 (1910), that where a way has been

> used, openly, uninterruptedly, continuously and exclusively for a period of more than twenty years, *the origin of the way not being shown*, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is. This presumption of a grant or adverse right is with us *prima facie* merely, and may be rebutted.

(Emphasis added.) To rebut this presumption, the owner of the fee simple interest must prove that the use was by permission or license or that denials or objections to the use had been made under circumstances that negated use by right or grant. *Id.* at 207-08, 68 S.E. at 354.

Because the majority paid no attention to the uncontradicted evidence that no one knew how the road came into existence, and because it did not consider the rule stated in *Williams*, it did not give Preas the benefit of the presumption to which he was entitled. Had the *Williams* presumption been afforded to Preas, the majority would have had to conclude that Preas had established a prescriptive right to use the road because McNeil did not produce a shred of evidence to rebut the presumption. In my opinion, the trial court did not err when it ruled that Preas established a prescriptive right to use the road.

The second issue concerns the present day use to which the road may be put by those who have a prescriptive right to use the road. With regard to this second issue, the majority opinion decides questions never advanced by either party. In simpler terms, the majority decides the second issue on a basis created by the majority out of whole cloth. Had the majority decided the case presented by the appellant, it would have been compelled to reach the opposite conclusion concerning the use to which the road may now be put by the Kingreys and, in my view, Preas.

The second assignment of error, framed by McNeil, reads as follows:

The Appellees cannot expand their use of McNeil's roadway from an occasional use for agricultural and residential purposes to a commercial use even if such prior occasional use established an easement by prescription.

The majority frames the second issue in the following terms: "In addition, we determined who bears the burden of showing not only the nature and character of a proposed change in the prescriptive use, but also that such change will cast no additional burden on the servient tract." McNeil makes no complaint about where the burden of proof was placed by the trial court. The matter was never discussed at trial.

On brief, McNeil complained that even if the Kingreys and Preas had established a prescriptive right to use the road, the question remained "whether their use of the roadway can be expanded to uses other than those which created the easement." McNeil contended on brief that the Chancellor permitted an expanded use of the road. The heart of McNeil's contention is that because the dominant estate had been rezoned commercial, the

scope of the use of the servient estate expanded, as a matter of law. The trial court rejected McNeil's claim of expanded use as a matter of law. In my opinion, the trial court was correct.

All of the property, including the disputed road, had been rezoned commercial by the time of the trial. The Kingreys and Preas claimed they had a right to use the road to serve their property — which was once rural agricultural and is now commercial. The trial court agreed. It ruled that "the Plaintiffs propose to develop their respective tracts for commercial purposes, gaining access thereto over the McNeil Roadway and that said proposed uses will not overburden their aforesaid easement, said uses being differences in degree only from the uses heretofore made of said easement by Plaintiffs."

The second issue has nothing to do with burdens of proof. The question is whether the trial court was correct in ruling that the use was not expanded beyond the scope of the original use because the proposed use differed in degree only from the original use, or whether McNeil is correct in saying that whenever the dominant estate changes from agricultural to commercial the servient estate is overburdened, as a matter of law.

We set forth the legal test in *Va. Hot Springs Co.* v. *Lowman*, 126 Va. 424, 430, 101 S.E. 326, 328 (1919). There we said that if a right of way depends solely upon the user, then the extent of the user is measured by the character of the user because the easement cannot be broader than the user and a right of way acquired for one purpose cannot be used for another. We wrote further that, "if the new use is in all respects of the same nature and character as the old, and the difference is in degree only, and no additional burden is put upon the servient estate, then the new use is within the prescriptive use." *Id.*

Here, the evidence was that during the prescriptive period, the road was used by trucks, farm vehicles, cars, and bicycles for ingress and egress to the property owned by the Kingreys and their predecessors and owned by Preas and his predecessors. The Kingreys and Preas submit that during the prescriptive period, the road was used for general vehicular traffic. They submit further that they intend in the future to use the road for general vehicular traffic. In my opinion, the trial court properly concluded on these facts that there was no impermissible expansion of the user.

Because the majority framed the second issue in a manner not advanced by any party, it failed to address McNeil's sole argu-

ment: that whenever the dominant estate changes in use, the servient estate necessarily changes in use. Had this argument been addressed, it should have been rejected because it is wrong.

Professor Minor makes clear that in considering whether a present use is within the scope of the prescriptive user, the focus is upon the use to which the servient estate is put: "The extent and mode of enjoyment of an easement by prescription depends upon the extent of the user during the prescriptive period and the *customary* mode of enjoyment thereof during that period." 1 R. Minor, *Minor On Real Property* (2d ed. 1928) at 143 (emphasis in original).

Further, in a discussion of extinguishing easements, Minor indicates the limited way in which a change in the dominant estate affects the servient estate: "[I]f the easement arises by *prescription*, a change in the dominant estate calling for a burden upon the servient land exceeding that devolving upon it by its *customary use* during the prescriptive period, if the increased use is *inseparable* from the former use, will operate an extinguishment of the easement." *Id.* at 150 (emphasis in original). This quote suggests that only where the change in the dominant estate increases the burden on the servient estate is there improper use. Such a matter cannot be resolved on the basis of a *per se* rule. Facts are required. In this case, those facts were found against McNeil.

Other treatise writers also indicate that a *per se* rule is out of place in this area of law. In 3 R. Powell, *Powell on Real Property* ¶ 416 (1987), the author wrote as follows:

Since . . . no use can ever be exactly duplicated, some variation between the use by which a prescriptive easement was created and the uses made under it after its creation is inevitable. The problem is to ascertain the limits of permissible variation . . . . *[T]he general principle applicable is that a use made under a prescriptive easement must be consistent with the general pattern formed by the use by which the easement was created. The only variations permitted are those which are consistent with that pattern.* Uses which conform to it must have characteristics sufficiently resembling those of the adverse use by which an easement was created so that they may fairly be described as being the same use. In determining whether a specific use is within the pattern of the establishing uses, courts consider (1) their simi-

larity or dissimilarity of purpose; (2) their respective physical attributes; and (3) *the relative burden caused by them upon the servient parcel.*

(Emphasis added.) In this case, again, these factors when applied to the facts, show the correctness of the trial court's disposition of this issue.

I would hold that Preas established prescriptive rights along with the Kingreys and that the Kingreys and Preas can continue to use the road for general vehicular traffic to and from their property.